UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Tri-County Wholesale Distributors, Inc.,
et al.,

      Plaintiffs,

-v-                                         Case No. 2:10-cv-693
                                                Judge Michael H. Watson

The Wine Group, Inc.,

      Defendant.

## OPINION AND ORDER

Plaintiffs in this diversity action are exclusive distributors of Defendant's wine within specified territories in Ohio. In July 2010, Defendant sent letters to Plaintiffs purporting to terminate their distributorships effective September 6, 2010. Plaintiffs move for a preliminary injunction enjoining Defendant from going forward with the termination. For the reasons that follow, the Court grants Plaintiffs' preliminary injunction motions.

## I. FACTS

Plaintiffs are Tri-County Wholesale Distributors, Inc. ("Tri-County"), the Bellas Company d/b/a Iron City Distributing ("Iron City"), Glazer's Distributors of Ohio, Inc. ("Glazer's Ohio"), and the Hammer Company ("Hammer") (collectively "Distributors" or "Plaintiffs"). The Distributors are Ohio corporations that distribute certain alcoholic beverages, including wine. Glazer's Ohio owns Hammer, and the two will be referred to collectively as "GDO." Defendant The Wine Group, Inc. ("TWG") is a California corporation that supplies wine products to various distributors in many states, including

Ohio.

Plaintiffs have been exclusive distributors of TWG's wine products within their respective territories for several decades. TWG's products account for 20% of Tri-County's sales, 7% of Iron City's sales, and 3.5% of GDO's sales. On July 2, 2010, TWG sent letters to Plaintiffs purporting to terminate their distributorships effective September 6, 2010. TWG stated in the letters that it decided to move distribution of its wine products in Ohio to a single statewide distributor, Dayton Heidelberg Distributing Company ("Heidelberg").

Tri-County filed this action on August 4, 2010, asserting a single count for declaratory and injunctive relief on the basis that TWG's purported termination of the distributorship violates the Ohio Alcoholic Beverages Franchise Act, Ohio Rev. Code § 1333.82, et seq. ("Franchise Act"). (Doc. 2.) Tri-County moved for a preliminary injunction on August 11, 2010. (Doc. 6.) Iron City joined as a plaintiff in the amended complaint and moved for a preliminary injunction on August 12, 2010. (Docs. 8 and 11.) Glazer and Hammer moved for a preliminary injunction on August 16, 2010 and appeared as plaintiffs in the second amended complaint on August 18, 2010. (Docs. 17 and 19.) TWG filed briefs in opposition on August 18 and 24, 2010 (Docs. 20 and 26) and Plaintiffs filed their reply brief on August 26, 2010. (Doc. 30.) The matter is fully briefed and ripe for decision.

## II. STANDARD OF REVIEW

The Court considers four factors in determining whether to issue a preliminary injunction: (1) whether the movant has established a substantial probability of success on the merits; (2) whether the movant would suffer irreparable harm in the absence of

an injunction; (3) whether an injunction would substantially harm third parties; and (4) whether an injunction would serve the public interest. *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010). The factors are not prerequisites; rather, they must be balanced. *Capobianco, D.C. v. Summers*, 377 F.3d 559, 561 (6th Cir. 2004).

## III. DISCUSSION

The Court must address a preliminary issue before it considers the four-factor test. Specifically, TWG argues that injunctive relief is not available under the Franchise Act. Rather, TWG contends, monetary damages are the sole remedy for a violation of the Act. The Court rejects TWG's argument. The Franchise Act contemplates suits for "damages *or other relief*." Ohio Rev. Code § 1333.87 (emphasis added). Moreover, numerous courts have issued injunctions preserving the rights of distributors under the Franchise Act until the merits could be fully litigated, a fact that presumably has not escaped the Ohio General Assembly's notice. *See, e.g., InBev USA LLC v. Hill Distrib. Co.*, No. 2:05-cv-298 (S.D. Ohio Mar. 31, 2005) (granting temporary restraining order); *Esber Beverage Co. v. Labatt USA Operating Co.*, No. 2009CV03142 (Stark Cty. Ohio Com. Pl. Dec. 1, 2009) (granting preliminary injunction).[1] The Court will therefore proceed to examine the four-factor test.

---

[1] In its motion for leave to file a sur-reply (Doc. 31), TWG argues that GDO is judicially estopped from asserting that injunctive relief is available under the Franchise Act because GDO took the opposite position in a case filed in the United States District Court for the Northern District of Ohio, *Superior Beverage Group, Ltd. v W.J. Deutsch & Sons, Ltd.*, No. 4:09-cv-444. GDO did not prevail on its argument in that case, however, and therefore TWG cannot satisfy the elements of judicial estoppel. *See Longaberger Co. v. Kolt*, 586 F.3d 459, 470 (6th Cir. 2009) (prior court must have adopted the party's inconsistent position for judicial estoppel to apply). Accordingly, the Court denies TWG's motion for leave to file a sur-reply.

## A. Likelihood of success on the merits

Plaintiffs advance two grounds for a preliminary injunction. First, they argue that TWG's purported termination of the distributorships violates the Franchise Act because the termination is not supported by "just cause." Second, Plaintiffs contend the Franchise Act precludes termination where, as here, the termination is based upon a reorganization of the manufacturer's business operations.

### 1. Just cause

The parties agree that the Franchise Act governs distributorships at issue. The parties also agree that the Franchise Act prohibits termination of alcoholic beverage distributorships absent "just cause." *See* Ohio Rev. Code § 1333.85. The parties differ sharply, however, as to what constitutes just cause. Plaintiffs argue that mere economic expediency, in the absence of some breach on the part of the distributor, cannot constitute just cause. In contrast, TWG asserts that termination for just cause requires only a rational business purpose.

The Franchise Act does not define "just cause." Nonetheless, it does provide that just cause does not include a unilateral decision to alter a franchise for reasons "unrelated to any breach of the franchise or violation of" the Franchise Act by the distributor. Ohio Rev. Code § 1333.85(B)(3). Plaintiffs rely primarily on a decision by this Court reflecting this principle: *Dayton Heidelberg Distrib. Co. v. Vintners Intern. Co. of New York*, No. C-3-87-436, 1991 WL 1119912 (S.D. Ohio Apr. 8, 1991). Similar to the instant case, the defendant in *Vintners* terminated the plaintiffs' distributorships "solely in order to implement a new marketing strategy which called for the consolidation of product distribution into the hands of fewer distributors." *Id.* at *6. The

consolidation was designed to make the defendant's brands more competitive and to increase profitability, and there was no allegation of wrongdoing on the plaintiffs' part. The court observed:

> [T]he Alcoholic [Beverages] Franchise Act was enacted to provide some protection to local distributors from the vagaries of the marketplace. If manufacturers could cancel franchises simply for business motivations, that protection would become illusory; there would be no need for such a legislative act. A rational manufacturer will never cancel a distributorship unless it feels that the cancellation would be to its profit and advantage. Thus, virtually all cancellations are for "legitimate business reasons," a fact surely well known to the Ohio legislature. Under a capitalist system of commerce, where a rational businessman always seeks to maximize profits, there is no need for a statute requiring the cancellation of a franchise agreement to be based upon a legitimate business reason. Therefore, just cause must mean something more than a manufacturer's unilateral determination that it could make more money if a franchise were terminated.
>
> Vintners contends, perhaps correctly, that this interpretation of the Act means that a manufacturer could be locked into an unprofitable situation if changing market conditions render its current distribution network inadequate. This may well be. However, the Ohio legislature has determined that this is a business risk which must be assumed by all manufacturers of alcoholic beverages which avail themselves of the rights and privileges of marketing their wares in Ohio. This Court can only interpret the will of the legislature; it cannot pass judgment on the wisdom of its pronouncements.
>
> Vintners argues strenuously that the case law supports its interpretation of the Act. This is not so. There are, in fact, no cases which deal with this particular situation, *i.e.,* where a manufacturer has cancelled a franchise without alleging any sort of discontent with that distributor's performance. In *Bonanno,* for example, the court found that the importer had permissibly cancelled a franchise because the distributor had failed to meet the importer's standards of "reasonable business aggressiveness." Vintners has made no such claim against Plaintiffs.

*Vintners*, 1991 WL 1119912, at *8. At least one Ohio court has reached a similar conclusion. *See Tri-County Distrib., Inc. v. Brown Forman*, No. 91 C.A. 225, 1993 WL 150297, at *3 (Ohio Ct. App. 7 Dist. May 4, 1993) (termination of distributorship for

reasons not related to distributor's performance lacked just cause).

Defendant relies chiefly on a decision from the Northern District of Ohio, *Superior Beverage Co. v. Schieffelin & Co.*, Nos. 1:05 CV 0834, 4:05 CV 0868, 2007 WL 2756912 (N.D. Ohio Sept. 20, 2007). As in the instant case, the defendant in *Schieffelin* terminated the plaintiffs' distributorships in order to consolidate its distribution network to a single distributor. The court in *Schieffelin* noted that "[t]he statute itself does not define just cause, but Ohio courts and federal courts sitting in Ohio have 'determined it to be a requirement of minimum rationality and business purpose.'" 2007 WL 2756912, at *5 (quoting *Dayton Heidelberg Distrib. Co. v. Vineyard Brands, Inc.*, 74 F. App'x 509, 512-513 (6th Cir. 2003)). "In other words, the Act 'does not require business people to act irrationally or counter to their best interest.'" *Id.* (quoting *Excello Wine Co. v. Monsieur Henri Wines,* 474 F. Supp. 203, 210 (S.D. Ohio 1979)). The court in *Schieffelin* opined that "only where the manufacturer's business dissatisfaction is entirely arbitrary is just cause lacking." 2007 WL 2756912, at *6. "Although the manufacturer may meet its burden by pointing to wrongdoing on behalf of the franchisee, the case law only requires bare business judgment." *Id.* Applying these principles, the *Schieffelin* court concluded that the defendant's business reasons for consolidating to a single distributor constituted just cause. 2007 WL 2756912, at *7.

*Vintners* and *Schieffelin* are irreconcilable. For the purpose of ruling on Plaintiffs' preliminary injunction motions, the Court finds the reasoning of *Vintners* to be more persuasive. As noted above, just cause does not include a unilateral decision to alter a franchise for reasons "unrelated to any breach of the franchise or violation of" the

Franchise Act by the distributor. Ohio Rev. Code § 1333.85(B)(3). *Vintners* gives effect to § 1333.85(B)(3), whereas *Schieffelin* does not.[2] Indeed, *Schieffelin* makes no mention of the provision. In addition, as the Court in *Vintners* observed, to allow termination of distributorships for mere business expediency, in the absence of any deficiency in the distributor's performance, would render the protections of the Franchise Act illusory. Further, although *Schieffelin* properly identified the minimum rationality test, it extrapolated that the test approves termination in the absence of deficient performance on the part of the distributor. The decisions upon which the court in *Schieffelin* relied, however, do not support such a conclusion because all of the decisions involved some manner of deficient performance by the distributor. For example, the Sixth Circuit decision cited in *Superior Beverage* found that just cause existed to terminate a distributorship where the distributor's sales declined while the sales of other Ohio distributors increased. *Vineyard Brands,* 74 F. App'x at 513 (finding decline in sales to be a "classic case of just cause"). Similarly, the Court in *Excello* found just cause present in light of late payments, the antagonistic and truculent attitude of the distributor's president, and irreconcilable conflicts in business philosophies. 474 F. Supp. at 209-10. For these reasons, the Court respectfully disagrees with the decision in *Schieffelin* and will instead follow *Vintners*. Under *Vintners* and Ohio Rev. Code § 1333.85(B)(3), TWG's desire to consolidate, without more, does not constitute just cause to terminate Plaintiffs' distributorships.

---

[2] Ohio Rev. Code § 1333.85(B)(3) was enacted during the pendency of *Vintners*. Finding the provision to be a clarification of existing law, the court in *Vintners* concluded that § 1333.85(B)(3) bolstered its analysis. 1991 WL 1119912, at *9-10.

This conclusion does not end the inquiry, however. TWG asserts additional reasons for its decision to terminate the GDO distributorships. In its termination letters sent to all of the Plaintiffs, TWG identified the various business advantages of moving to a single distributor for Ohio. In its letters to the GDO distributorships, TWG identified three additional reasons for termination:

8. There is a fundamental conflict in business philosophy with TWG and management of Glazer's have on more than one occasion displayed an antagonistic attitude towards and made inappropriate comments to TWG employees.

9. Glazer's owns and distributes a product called PrimeTime that Glazer's specifically helped to design to be directly competitive with and specifically targeted to decrease market share of TWG's MD 20/20 brand. MD 20/20 is distributed by Glazer's in the State of Ohio and certain other states.

10. Glazer's role in determining the 5L shelf sets at Kroger has resulted in our Franzia and Almaden brands receiving less than their fair share of shelf space. We believe Franzia and Almaden will endure out of stocks and loss of sales due to their receipt of less than their fair share of shelf space.

(Sec. Am. Compl. (Doc. 19) Ex. 1.) Plaintiffs argue the additional reasons are pretextual and cannot constitute just cause. The Court will address the additional reasons under the minimum rationality standard.

TWG's first additional reason pertains to an alleged conflict in business philosophy, antagonism, and inappropriate comments to TWG employees. TWG supports its allegations with the declaration of Ken Lizar, the Chief Sales Officer of TWG. Lizar describes the deterioration of the relationship between TWG and the family of companies owned by or affiliated with Glazer's Wholesale Drug Company, Inc. ("Glazer's"), a Texas company that is one of the largest distributors of alcoholic

beverages in the United States.[3] Lizar avers, *inter alia*:

> TWG's relationship with Glazer's has become difficult and problematic the last several years due in large part to Glazer's making certain threats and highly inappropriate and offensive comments. In April 2007, Glazer's threatened to cause irreparable harm in the marketplace by destroying TWG's products and threatening to "let the birds shit on them." The threat of damaging TWG's products was repeated at a meeting held in April 2008. In addition, an executive vice president of Glazer's has threatened my life on more than one occasion. The executive vice president also told a competitor of Glazer's to pass along the message that "the funeral is free." I believed these threats to be genuine and real given the reputation and personality of the individual making the threats. I've never been threatened repeatedly and this manner by a representative of a distributor in my almost 30 years in the industry.

Lizar Decl. ¶ 11 (Brief in Op. (Doc. 26) Ex. 4.) GDO does not deny Lizar's allegations. Instead, it argues the Court should disregard them. First, GDO contends that the allegations were part of litigation between TWG and other Glazer's affiliates in Texas. It then characterizes TWG's reliance on the threats as a basis for termination as an attempt to "relitigate" the Texas case, and notes that the documents supporting Lizar's declaration were subject to a protective order in that case. Second, GDO maintains that TWG improperly attempts to impute the conduct of Glazer's to GDO, when in fact Glazer's and GDO are separate legal entities.

The Court finds GDO's first ground for disregarding Lizar's allegations to be without merit. The mere fact that the allegations have some connection to a Texas lawsuit that was settled does not render them off limits as a basis for the exercise of TWG's business judgment. Simply stated, the settlement of the Texas litigation does not require TWG to forget what happened.

---

[3] TWG submits a document which indicates that Glazer's enjoyed $3 billion in sales in 2008.

GDO's second ground for disregarding Lizar's allegations fares better. Throughout its brief, TWG refers to Glazer's and GDO interchangeably. Although TWG says that it believes that GDO is owned by Glazer's, GDO's president, John Roberts, denies an ownership relationship and maintains the companies are affiliates. Roberts Decl. ¶ 3 (Reply (Doc. 30) Ex. 11.) Most significantly, TWG offers no evidence of threats or other similar misconduct on the part of GDO, its officers, or employees. Roberts states that he is unaware of any personality or business conflicts between GDO and TWG, and describes the business dealings between GDO and TWG as "professional." *Id.* at ¶ 4. TWG's first additional reason for terminating GDO's distributorships rests entirely on the conduct of Glazer's and its Texas affiliates in which GDO played no part. Thus, TWG's justification boils down to guilt by association, which strikes the Court as arbitrary.

The second additional reason TWG offers is that Glazer's owns and distributes a product called PrimeTime which competes directly with TWG's MD 20/20. GDO responds that distributors routinely sell competing products. This is hardly surprising, given that GDO, like many distributors, distributes alcoholic beverage products from multiple suppliers. In light of this fact, it is therefore also not surprising that GDO and TWG have never entered into a non-competition agreement limiting the brands that GDO is permitted to distribute. Furthermore, GDO states that it began marketing PrimeTime about four months ago, and never received any complaints or inquiries about its distribution of PrimeTime before the July 2, 2010 termination letter. On the current record, TWG's second additional reason for terminating GDO's distributorships appears to be more pretext than rational business judgment.

TWG's third additional reason for terminating GDO's distributorships concerns the amount of shelf space allotted for TWG's Franzia and Almaden brands at Kroger grocery stores. GDO explains that an arrangement exists between Kroger and E&J Gallo Wines ("Gallo"), and Constellation Wines U.S. ("Constellation"), under which Gallo and Constellation, as "category captains," determine the placement of wine boxes on Kroger's shelves. Roberts Decl. ¶ 10 (Reply (Doc. 30) Ex. 11.) Even so, upon TWG's request, GDO approached Gallo with TWG's concerns. Gallo rebuffed GDO. *Id.* GDO relayed this information to TWG, which indicated to GDO that it was disappointed but understood. *Id.* GDO did not hear from TWG on the issue again until the July 2, 2010 termination letter. *Id.* In these circumstances, TWG's attempt to blame GDO for the shelf space issue appears to be disingenuous.

On the current record, and for purposes of ruling on Plaintiffs' preliminary injunction motions only, the three additional reasons offered by TWG for the termination of GDO's distributorships, viewed separately or together, fall short of just cause, even under the deferential minimum rationality standard.

For the above reasons, the Court concludes that Plaintiffs have made a substantial showing that TWG's purported termination of Plaintiffs' distributorships is not supported by just cause, and therefore violates the Franchise Act.

### 2. Reorganization

The parties do not dispute that the Franchise Act precludes termination of a distributorship on the basis of "restructuring, other than in bankruptcy proceedings, of a manufacturer's business organization." Ohio Rev. Code § 1333.85(B)(2). Plaintiffs argue that this provision of the Franchise Act bars termination of their distributorships,

noting that in its termination letters, TWG states that the move to a single Ohio distributor is part of "an ongoing nationwide plan of reorganization of TWG's distribution network." (Mot. for Prelim. Inj. (Doc. 6) Ex. 1.)  TWG maintains that § 1333.85(B)(2) does not apply because the reorganization concerns only TWG's external distribution network rather than TWG itself.

Although it seems reasonable to equate "reorganization" with "restructuring," it is far less clear that TWG's "distribution network" fits within the meaning of "manufacturer's business organization."  Any determination of this issue will necessarily require some factual development concerning the nature of TWG's distribution network, TWG's relationship to its distributors, and its plan to reorganize the distribution network, not to mention a thoughtful interpretation of the statutory term "manufacturer's business organization."  Given the lack of a more robust factual record, and the parties' relatively perfunctory arguments on the issue, the Court cannot say at this juncture that Plaintiffs have demonstrated a substantial likelihood of success on their claim that termination of the distributorships would violate Ohio Rev. Code § 1333.85(B)(2).

## B. Irreparable harm

Plaintiffs contend they will suffer irreparable harm if an injunction is not issued because termination of their TWG distributorships would lead to a loss of good will and business reputation, which cannot readily be translated into monetary damages.  Plaintiffs also assert that termination of the franchises would put them in the untenable position of having to compete against brands they have promoted for many years.

TWG argues that Plaintiffs have an adequate remedy at law, namely, a claim for monetary damages.  TWG also notes that the Franchise Act itself contemplates

monetary compensation for loss of goodwill. See Ohio Rev. Code § 1333.85(D).

As Plaintiffs note, however, § 1333.85(D) addresses the lawful termination of a franchise following the acquisition of brands by a successor manufacturer. In such a case, the Ohio General Assembly permits termination, but requires the successor to provide some compensation for loss of good will. This is hardly a legislative determination that loss of good will is not difficult to calculate, let alone that a distributor should be compelled to accept an award of damages for loss of good will where the termination is unlawful.

In a decision cited by both sides in this conflict, the Sixth Circuit stated that "a plaintiff's harm is not irreparable if it is fully compensable by money damages." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). Nevertheless, the same court also recognized that "[t]he loss of customer good will often amounts to irreparable injury because the damages flowing from such losses are difficult to calculate." *Id.* at 512. Here, TWG's products comprise a significant portion of Plaintiffs' sales. Moreover, Plaintiffs have promoted and distributed TWG's beverages for decades. It is therefore reasonable to infer that Plaintiffs have acquired substantial good will in connection with their distribution of TWG's products, which include, in TWG's own words, "several unique, high velocity wines." In light of these circumstances, the Court finds that Plaintiffs have adequately demonstrated irreparable harm.

## C. Harm to others

TWG argues that it will suffer harm if an injunction is issued because an injunction would thwart its cost saving consolidation plan. It also argues that an

injunction would take away potential sales from Heidelberg.

An injunction would deny or at least delay the benefits TWG hopes to reap as a result of the its consolidation plan. Similarly, an injunction would deny or at least delay Heidelberg's opportunity to enjoy the expected rewards of becoming TWG's sole state-wide distributor. But these lost or delayed expectations must be put in their proper perspective. Plaintiffs request only a status quo injunction. Such an injunction would not place TWG or Heidelberg in a worse position than they were in before the injunction.

## D. Public interest

Plaintiffs contend that the public interest is advanced by enforcement of the provisions of the Franchise Act. Plaintiffs also suggest that an injunction would benefit the public interest because it would preserve jobs that might otherwise be lost if termination of the distributorships is allowed to proceed. TWG maintains that its proposed state-wide consolidation would help to maintain or even reduce the price of wine to consumers.

The Court finds that giving effect to the Ohio General Assembly's valid and duly enacted laws generally furthers the public interest. Likewise, preserving jobs, particularly at this time of high unemployment, benefits the public. Given the unique nature of alcoholic beverages, which are a blessing to many, but a curse to more than a few, the Court feels less strongly that knocking a quarter off the price of MD 20/20 would provide a measurable benefit to the public. Overall, the public interest would be served by an injunction.

### E. Balancing of the factors

Plaintiffs are likely to succeed on the merits of their claim that TWG's purported termination of their distributorships violates the Franchise Act, specifically, Ohio Rev. Code § 1333.85(B)(3). In addition, Plaintiffs have adequately demonstrated that irreparable harm in the form of loss of good will and business reputation will result in the absence of injunctive relief. An injunction would cause TWG and Heidelberg to suffer lost or delayed expectations, but would not make their positions worse than they currently are. The public interest favors an injunction. These factors, considered together, weigh in favor of the issuance of a status quo preliminary injunction.

### F. Unclean hands

As a final matter, TWG contends that GDO is not entitled to an injunction because it comes to the court with unclean hands. TWG alleges that GDO approached it on more than one occasion expressing interest in becoming TWG's single consolidated distributor in Ohio. The Court, however, is not persuaded that a mere expression of interest in consolidation, which TWG rejected, rises to the level of reprehensible conduct necessary to justify withholding equitable relief. *See Bonner Farms, Ltd. v. Fritz*, 355 F. App'x 10, 17 (6th Cir. 2009).

## IV. DISPOSITION

For the above reasons, the Court **GRANTS** Plaintiffs' motions for a preliminary injunction. (Docs. 6, 11, and 17.) The Court **DENIES** TWG's motion for leave to file a sur-reply. (Doc. 31.)

Accordingly, the Court preliminarily **ENJOINS** TWG from: (1) terminating

Plaintiffs as distributors; (2) entering into any contracts that enable another distributor of the Tri-County, Iron City, and GDO TWG Brands to operate in Tri-County, Iron City, and GDO's respective exclusive territories or otherwise purporting to allow for the appointment of new distributors in such territories; and (3) taking any action that would frustrate or otherwise prevent the delivery of the Tri-County, Iron City, and GDO TWG Brands to Tri-County, Iron City, and GDO, respectively, as required under the existing franchises and Ohio law.

Plaintiffs shall post bond in the amount of $50,000.

**IT IS SO ORDERED.**

_____
**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**